## UNITED STATES v. HAYES et al.

District Court, E. D. New York.

Oct. 15, 1931.

Alfred McKenzie, Asst. U. S. Atty., of Brooklyn, N. Y., for the United States.

Louis Halle, of New York City, for defendants.

SHEPPARD, District Judge.

James Hayes, master, and members of the crew of the yacht Surf, are under indictment in this court for a conspiracy to violate sundry provisions of title 2 of the National Prohibition Act, including substantive offenses as well as certain provisions of the Tariff Law. The yacht was seized in the territorial waters of the United States off Montauk Point, by officers of the Coast Guard Cummings for the transportation of liquor in violation of the National Prohibition Act (27 USCA).

The present motion to suppress the evidence is because same was obtained "without probable cause," to justify the search and seizure of the vessel. The confusion as to authority of the Coast Guard to board American vessels within the territorial waters of the United States and the American Merchant vessels on the high seas to inspect for infractions of the Tariff and Navigation Laws, as contradistinguished from the right to board and inspect for violations of the Prohibition Act, due to conflicting decisions, delayed a ruling on the motion which on first presentation seemed not difficult. The Pesaquid (D. C.) 11 F.(2d) 308; Strom v. U. S. (C. C. A.) 50 F.(2d) 547; and cases cited in Sebastopol and Mildred (D. C.) 47 F.(2d) 336.

I had thought that the protection of the revenue for the maintenance of the government was so important that the Coast Guard, under section 581 (19 USCA § 481), and cog-

nate sections of the Tariff Act, might board any vessel within the twelve-mile limit "with respect to the revenue," regardless of the "cut of the jib," or whether it was a pleasure yacht or other craft [contra: Fish v. Brophy (D. C.) 52 F.(2d) 198], since all vessels of more than five tons burden are required to be documented, or otherwise officially designated. Vessels therefore, without distinction, are subject to the scrutiny of the Coast Guard and customs officials within the jurisdiction, without "probable cause" or a search warrant. The Pilot (C. C. A.) 43 F.(2d) 491. The cases of Maul v. United States, 274 U. S. 501, 47 S. Ct. 735, 742, 71 L. Ed. 1171, and United States v. Lee, 274 U. S. 559, 47 S. Ct. 746, 71 L. Ed. 1202, interpret section 581 of the Tariff Act to mean, I take it, just that authority to the extent at least of territorial waters of the United States. The concurring opinion of Justices Brandeis and Holmes in the Maul case, supra, thought the majority opinion should have extended the right to board and inspect American Merchant vessels anywhere on the high seas "affecting the enforcement not only of the Navigation Laws, but also of the customs laws, the National Prohibition Law, and others."

The Maul Case upholds the right of the Coast Guard to board vessels in the territorial jurisdiction within or without the particular customs districts and with "respect to Navigation Laws and Customs," may board and inspect any vessel. Except for the opinion of Mr. Justice Brandeis in the Maul Case, there seems to be no case which may be implied authority to search in the absence of probable cause for violation of the Volstead Law.

The authority for the search of vehicles "with respect to the revenue without 'probable cause,'" would seem to be limited to the border, and it may be that the boarding of vessels for any purpose other than to inspect for compliance with the Navigation Laws or with "respect to the revenue" is limited to "probable cause," save when there is imminent an unlawful importation of taxable merchandise. This view is accentuated when it is recalled that the National Prohibition Law requires an affidavit of sale of inhibited liquor in a dwelling occupied exclusively as such before a search warrant therefor is justified. I cannot accept as authority, however, District Court decisions which hold that a vessel engaged in smuggling whisky of foreign manufacture into the United States is amenable under the Prohibition Act only for unlawful transportation, and that the mere incident of *transportation* characterizes the offense of importing intoxicating liquors, whether dutiable or otherwise, as liable to be forfeited only under section 26, title 2, of the National Prohibition Act (27 USCA § 40), only after conviction by a jury of the persons responsible for the importation. I cannot concede that the single element of transportation, anywhere and under all circumstances, invokes exclusively the provisions of the National Prohibition Act. It is true that Richbourg Motor Company v. United States, 281 U. S. 528, 50 S. Ct. 385, 74 L. Ed. 1016, 73 A. L. R. 1081, holds that a *vehicle* seized when transporting whisky as defined in the National Prohibition Act, may be forfeited only after the manner prescribed in section 26, title 2 (27 USCA § 40), but in my opinion this was not meant to supersede or displace the prosecutions and forfeitures in rem under the provisions of the Tariff Act, and other Revenue Laws, when the facts disclose an intent to defraud the government of the revenue. This view must be the logical deduction from the decision in United States v. One Ford Coupe, 272 U. S. 321, 47 S. Ct. 154, 71 L. Ed. 279, 47 A. L. R. 1025, which is to the effect that there is no direct conflict between section 26, title 2, of the National Prohibition Act (27 USCA § 40), and section 3450, Rev. St. (26 USCA §§ 1181, 1182), when the contraband liquor was concealed in the seized vehicle, and accompanied by evidence to show intent to defeat the revenue.

In this connection it may be borne in mind that section 5 of the Willis-Campbell Act, 42 Stat. 222, 223 (27 USCA §§ 3, 53, 54), continued all laws relating to manufacture, taxation, and traffic in intoxicating liquors and penalties in force when the National Prohibition Act was adopted except those directly in conflict with the Volstead Act. U. S. v. One Ford Coupe, supra; U. S. v. La Franca, 282 U. S. 569, 51 S. Ct. 278, 75 L. Ed. 551. Where, however, there has been an election to prosecute under the Prohibition Act, it constitutes a bar to proceedings under the Revenue Acts. Port Gardner Investment Co. v. U. S., 272 U. S. 564, 47 S. Ct. 165, 71 L. Ed. 412; and Commercial Credit Co. v. U. S., 276 U. S. 226, 48 S. Ct. 232, 72 L. Ed. 541. It will be observed that these cases, as well as the Richbourg Case, supra, involve the seizure of *vehicles* in the act of transporting intoxicating liquors on inland highways, from

which I can find no authority for exempting *vessels* from search and seizure in rem when in the act of smuggling foreign manufactured liquors into the United States. Forfeiture exclusively under provisions of section 26 of title 2 of the National Prohibition Act has been interpreted as intended to protect innocent owners and lienors of automobiles traversing the highways with contraband from the loss of their security, and is doubtless applicable to vehicles on highways, and probably boats and "other water craft" on inland waterways, but should not be strained to the impairment of the Revenue Laws. The motion here is to suppress the evidence to be used in the prosecution of a conspiracy to violate certain provisions of the Prohibition and Tariff Acts; such evidence is alleged to have been obtained by an unreasonable search of the Surf. "Probable cause" was not a prerequisite for authority of the Coast Guard patrol to board the vessel to inspect for any violation of the navigation, tariff, or other laws of the United States; but the facts indicate that the officers of the "Cummings" suspected the yacht had a cargo of intoxicating liquor and assumed that "probable cause" was requisite to justify boarding, inspection, and examination. If that were the distinct purpose, it may be that a showing of "probable cause" was a prerequisite under the provisions of the Prohibition Act for a search for intoxicating liquor. Assuming, but not deciding, that search for this purpose under the circumstances disclosed must be predicated on "probable cause," the material facts, as to which there is no serious conflict, may be summarized.

More than a month prior to the seizure of the Surf on June 14, 1931, an informant, whose name was not disclosed but who was described as being in the employ of the government and known to be reliable, reported to Alfred J. Wing, Customs Agent for the port of New York, that the steam yacht Surf had been purchased by a "liquor combination," and was being reconditioned for use in the rum traffic. Agent Wing imparted this information to Captain Lauriat, the executive officer of the New York Coast Guard Base, and instructed the informant to keep watch on the movements of the Surf.

On about June 12th the informant reported to Wing that the Surf was about to make a cruise. Wing notified Captain Lauriat of this fact and instructed him to keep the boat under constant observation and to

board her wherever encountered. Captain Lauriat advised Commander Stone of the Cummings of the suspicions of the Surf on June 13th, on which date the Cummings embarked on a cruise.

About 4:30 a. m. the following day, one of the crew of the Cummings sighted the lights of a vessel about 80 miles off Montauk Point proceeding in the direction of Shinnecock Lighthouse from the general direction of the location of three British vessels anchored off the coast and known to be laden with liquor.

The course of the Cummings was changed, and the vessel, when overtaken by it, proved to be the Surf. Commander Stone personally examined the yacht through his glasses when within 100 yards, and testified that she appeared to be heavily laden, as her painted water line was flush with the surface of the water, whereas in yachts of that type it usually extended six to eight inches above the surface; that the Cummings circled the yacht, and he observed that the port holes were covered and there was no sign of any party of yachtsmen aboard; that her port side was freshly scarred amidships as if she had recently been alongside of another vessel. The Cummings trailed the yacht for some time and once ran over her log line, which is an affront at which any legitimate vessel would ordinarily protest, but no complaint was made.

When the two vessels reached a point about 1.7 miles off Montauk Point, on the afternoon of June 14th, the Surf was hailed by Commander Stone and directed to heave to for a boarding party. She did so and was boarded by a party in command of Lieut. Maley, who demanded to see the ship's papers and the license of the master. The papers were produced and were apparently in order, but the master produced his license from a drawer in the cabin, whereas it should have been posted behind glass in the Pilot House. The master of the Surf then introduced the defendant Price to Lieut. Maley, as Mr. Deery, the owner of the yacht. When Maley announced that it would be necessary to search the yacht, "Mr. Deery" gave his assent and they went below. Before any liquor was actually discovered by Maley, he was taken aside by "Deery," who stated that liquor was aboard in which his life savings were invested and asked if nothing could be done about it, saying that he could offer $10,000. Maley refused the bribe and ordered the search, which revealed a large quantity of liquor of foreign manu-

facture. Lieut. Maley then assembled the crew on deck and demanded a manifest for the cargo. When none was produced owner, master, and crew were placed under arrest.

"Probable cause" has been defined by the Supreme Court as "reasonable ground of suspicion, supported by circumstances sufficiently·strong in themselves to warrant a cautious man in the belief that the party is guilty of the offense with which he is charged." Stacey v. Emery, 97 U. S. 642, 645, 24 L. Ed. 1035.

I conclude therefore that "probable cause" existed. Husty v. U. S., 282 U. S. 694, 51 S. Ct. 240, 75 L. Ed. 629; Awalt v. U. S. (C. C. A.) 47 F.(2d) 477; U. S. v. Davidson (C. C. A.) 50 F.(2d) 517, 518; Carroll v. U. S., 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790.

The motion to suppress is overruled.